IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| SP 260 LIMITED PARTNERSHIP, | ) | |
| | ) | |
| Plaintiff, | ) | TC-MD 250104R |
| | ) | |
| v. | ) | |
| | ) | |
| DESCHUTES COUNTY ASSESSOR, | ) | |
| | ) | |
| Defendant. | ) | **DECISION** |

Plaintiff appeals the Deschutes County Property Value Appeals Board real property

orders for Accounts 118410 and 118414, mailed February 27, 2025, for the 2024-25 tax year.

(Compl at 1-3.)  A trial was held on January 27, 2026, at the Oregon Tax Court, in Salem,

Oregon.  Alex Robinson, of the CKR Law Group, P.C., appeared on behalf of Plaintiff.  T. Chad

Plaster (Plaster), appraiser with Moscato Okoneski, & Associates, Inc., testified on behalf of

Plaintiff.  David Doyle, Deschutes County Counsel, appeared on behalf of Defendant.  Daniel

Russell (Russell), county appraiser, testified on behalf of Defendant.  Plaintiff's Exhibit 1 and

Defendant's Exhibits A and B were received into evidence.  Plaintiff's objection to admission of

Exhibit B was overruled.

## I.  STATEMENT OF FACTS

A.    *Subject Property and Roll Values*

The subject property is a 260-unit apartment complex in Bend, Oregon, situated on 9.57

acres.  The complex was completed in 2023.[1]  It consists of nine residential buildings—including

---

[1] Plaintiff conceded for purposes of this trial that the subject property would be considered stabilized, even though it was still in a lease-up phase as of January 1, 2024.  Defendant's report did the same but adjusted for the incomplete pool.  A property is stabilized when it has a "stabilized occupancy":

"The occupancy of a property that would be expected at a particular point in time, considering its relative competitive strength and supply and demand conditions at the time, and presuming it is

DECISION  TC-MD 250104R
1

eight three-story garden-style buildings and one four-story central building—and six detached garages. (Ptf's Ex 1 at 29-31, 37-38.) Amenities include a clubhouse, elevators, exercise facilities, game room, lounge, two pools, a pet washing station, and a golf simulator. (*Id.* at 32-41.)

The Deschutes County tax roll values for the 2024-25 tax year, sustained by the Property Value Appeals Board, were:

| Account | Land | Improvements | Total |
|---------|------|--------------|-------|
| 118410 | $1,901,560 | $16,096,100 | $17,997,660 |
| 118414 | $3,864,960 | $57,307,000 | $61,171,960 |
| **Total Roll Value** | | | **$79,169,620** |

(*See* Compl at 3-6.)

B.    *Appraisal Framework and Approaches Considered*

Plaster prepared a retrospective appraisal of the subject property as of January 1, 2024, on behalf of Plaintiff. He presented facts tending to demonstrate that a higher capitalization rate (cap rate) was warranted due to market conditions. Defendant presented an appraisal prepared by Russell, a Deschutes County appraiser. He presented facts tending to demonstrate that current market sales warranted a lower cap rate.

Both appraisers agreed that the highest and best use of the subject property was the existing apartment complex. Both considered the three traditional approaches to value: cost, sales comparison, and income. They agreed that the income approach was the superior method for valuing a large income-producing apartment complex.

---

priced at market rent and has had reasonable market exposure. A property is at stabilized occupancy when it is capturing its appropriate share of market demand."

Appraisal Institute, *The Dictionary of Real Estate Appraisal* 180 (7th ed 2022). Based on the parties' agreement, the court will treat the property as stabilized.

Generally, under the income approach, an appraiser estimates the value of income-producing property by analyzing the income the property is capable of generating. The appraiser typically begins by estimating the property's potential gross income from market data, then makes appropriate adjustments for vacancy, collection loss, and other relevant factors to determine effective gross income. The appraiser then deducts reasonable operating expenses to arrive at net operating income, or NOI. In direct capitalization, the NOI is converted into an indication of value by dividing it by an appropriate cap rate. The cap rate is generally derived from market data and reflects the relationship between income and value, including investors' expectations regarding risk, return, financing conditions, and the characteristics of the property. *See* Appraisal Institute, *The Appraisal of Real Estate* 429-433 (15th ed 2020).

The parties and a third-party bank appraisal all reached closely aligned income and expense conclusions. The difference between the parties' NOI calculations is very small.[2] Thus, the parties focused on the cap rate – the market conditions relating to the risk associated with the investment. A secondary dispute concerns the allocation of total value between land and improvements. Because the 2024-25 tax year is the first roll year after final construction, that allocation affects the computation of maximum assessed value (MAV) going forward.

C.     *Land Value Evidence*

1.     *Plaintiff's land value evidence*

Plaster valued the land value as though vacant. (Ptf's Ex 1 at 62.) He considered five land sales and one listing (each a "comparable") in Bend and Redmond using a price-per-unit methodology, "which applies the relationship between a comparable property's sale price and the

---

[2] Plaintiff's NOI is $5,051,744 (Ptf's Ex 1 at 98); Defendant's NOI is $5,245,250 (Def's Ex A at 59); and the bank's NOI is $5,131,181. (Def's Ex B at 104).

number of units available or planned for development to that of the subject [property]." (*Id*. at 63-66.) The subject property is zoned RH (Residential High Density), which allows up to 43 units per acre. (*Id*. at 31.) This zoning capacity bears on whether per-unit pricing aligns with legal achievable density.

Plaster's land sales/listings were as follows:

| | DATE OF SALE | LOCATION | MUNICIPALITY | UNITS | TRANSACTION PRICE | $/UNIT |
|---|---|---|---|---|---|---|
| 1 | 5/27/2022 | 2036 NW Canal Blvd | Redmond | 252 | $6,125,000 | $24,306 |
| 2 | Listing | 1081 SW Mount Bachelor Drive | Bend | 297 | $7,450,000 | $25,084 |
| 3 | 7/31/2023 | 1271, 1285 NW Wall St | Bend | 112 | $2,900,000 | $25,893 |
| 4 | 1/18/2023 | 105 NE Franklin Ave | Bend | 191 | $5,100,000 | $26,702 |
| 5 | 3/11/2022 | 1850 SW Umatilla Ave | Redmond | 156 | $5,500,000 | $35,256 |
| 6 | 10/11/2022 | NE 27th St & NE Mary Rose PL | Bend | 170 | $6,095,000 | $35,853 |

Per-unit prices ranged from $24,306 to $35,853. Plaster believed comparables 3 and 4 required demolition adjustments. (Ptf's Ex 1 at 62-63.) He bracketed the subject property between comparable 4, a commercial property with a building on it to which he applied a $500,000 reduction for demolition, and comparable 5, a commercial-zoned property designed for a 137-unit apartment complex. (*Id*. at 68.) He gave greater weight to comparable 4 and concluded with a land value of $30,000 per unit. Multiplying by 260 units yielded a land value of $7,800,000. (*Id*. at 68-69.)

2.    *Defendant's land value evidence*

Russell analyzed four land sales and one active listing. Comparable 1 was a 5.73-acre site that sold in October 2022 for $6,095,000, or $24.42 per square foot. Russell adjusted that sale downward for time, lot size, and condition to $19.50 per square foot. (Def's Ex A at 29.) Comparable 2 was a 4.17-acre site that sold in February 2024 for $2,450,000, or $13.49 per square foot. Russell adjusted that sale downward for location and lot size to $11.71 per square foot. Comparable 3 was a 3.98-acre site that sold in April 2024 for $3,350,000, or $19.32 per

square foot. Russell adjusted that sale downward for lot size to $18.43 per square foot. Comparable 4 was a 14.8-acre site that sold in May 2022 for $6,125,000, or $9.50 per square foot. Russell adjusted that sale upward for location and lot size and downward for zoning to $10.57 per square foot. Comparable 5 was an active listing only at $35.12 per square foot. (*Id.*)

Starting with the low sale of $9.50 per square foot and the high sale of $24.40 per square foot, after adjustments, the range narrowed to between $10.57 per square foot and $19.50 per square foot. (Def's Ex A at 35.) Russell gave the greatest weight to comparable 1 and concluded with a land value of $16.00 per square foot. Multiplying the subject property's 416,689 square feet by $16.00 per square foot produced a rounded land value conclusion of $6.7 million. (*Id.*)

3.    *Bank appraisal land value evidence*

The bank appraisal also developed a land-value conclusion using a "price per potential dwelling unit" methodology. (Def's Ex B at 68.) The appraisers adjusted the comparable sales for time, location, density, property characteristics, and other factors. (*Id.*) Plaintiff and the bank appraisal selected the same land sales. (*Compare* Ptf's Ex 1 at 62 *with* Def's Ex B at 70.) The bank concluded that the average price was approximately $29,000 per unit, after adjustments, and selected a value of $28,500 per unit, resulting in a land value of $7,410,000. (Def's Ex B at 70.)

D.    *Income and Expense Evidence*

The parties' income and expense conclusions were similar in most respects. The primary difference in their NOI conclusions resulted from their vacancy and collection-loss assumptions.

///

///

1.    *Plaintiff's income and expense evidence*

Plaster prepared a stabilized income approach for the subject property. His report reviewed historical Phase 1 operating expenses for 2024 and 2025 through March, a 2024 budget, and a developer's pro-forma operating statement for the proposed Phase 2 development. Plaster then developed his own stabilized income and expense projection for the subject property. (Ptf's Ex 1 at 96.)

Plaster projected rental revenue of $6,578,400. He also projected reimbursement revenue of $169,000 and miscellaneous revenue of $325,600, consisting of parking and carport income, garage rents, pet rent, and fees or other income. Those figures produced potential gross revenue of $7,073,000. (Ptf's Ex 1 at 96.) Plaster deducted vacancy and collection loss of $707,300, equal to 10 percent of potential gross revenue. After that deduction, he concluded effective gross revenue of $6,365,700. (*Id.*)

To support that allowance, Plaster evaluated economic and market conditions affecting multifamily residential developments in the Bend area. He identified a robust pipeline of new apartment construction from 2010 through 2024. (Ptf's Ex 1 at 43, 49.) Plaster also presented population data showing that Bend grew 47.3 percent from 2000 to 2010, 21.1 percent from 2010 to 2020, and 14.5 percent from 2020 to 2023. Oregon grew 12 percent, 11.4 percent, and 0.5 percent during the same periods. (*Id*. at 48.)

The building permit data showed substantial multifamily residential building permits in Bend and Deschutes County from 2013 to 2023. Plaster viewed the robust pipeline of new apartments between 2010 and 2024 as demonstrating a strong development market that mirrored population growth. (Ptf's Ex 1 at 49.) Bend multifamily residential building permits issued from 2013 to 2023 are shown in the following chart:

| MULTI-FAMILY RESIDENTIAL BUILDING PERMITS ISSUED | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
| Bend | 794 | 791 | 889 | 1,014 | 946 | 865 | 642 | 710 | 710 | 574 | 995 |
| Redmond | 100 | 148 | 191 | 279 | 311 | 422 | 361 | 551 | 192 | 228 | 108 |
| Deschutes County | 1,190 | 1,225 | 1,525 | 1,817 | 1,777 | 1,818 | 1,488 | 1,792 | 1,003 | 935 | 1,205 |

*Through March

(*Id*. at 48.)

For the 2020 through 2022 period, long-term vacancy increased by slightly more than 5 percentage points to approximately 8.5 percent, although Bend remained below the county rate. (Ptf's Ex 1 at 50.) Both long-term rents and short-term rents increased by at least 10 percent during the relevant period. (*Id*. at 51.)

Plaster cited the State of Oregon's Office of Economic Analysis December 2023 report discussing a possible recession and modest population rebound. He also examined the economic impacts of the Covid-19 pandemic, including a sharp increase in unemployment in 2020 followed by a substantial decline. Unemployment in the Bend-Redmond area remained relatively steady more recently, declining from 4.4 percent in December 2022 to 3.6 percent in December 2023. (Ptf's Ex 1 at 44.)

Plaster reported that vacancy rates had increased significantly during the two quarters preceding the assessment date and that rents had stagnated because of increased competition from substantial additional supply entering the market. (Ptf's Ex 1 at 58.) After deducting vacancy and collection loss, Plaster concluded effective gross revenue was $6,365,700. (*Id*. at 95-96.)

///

///

///

Plaster projected total operating expenses of $1,313,956. His expense projection included insurance, repairs and maintenance, turnover expenses, landscaping, advertising, utilities, management fees, administrative fees, and reserves. After deducting operating expense from effective gross revenue, Plaster concluded an NOI of $5,051,744. (Ptf's Ex 1 at 96, 98.)

2.    *Defendant's income and expense evidence*

Russell also prepared a stabilized income approach for the subject property. Defendant's income model used the subject property's 260 units and estimated market rent by unit type. The unit mix consisted of 79 one-bedroom/one-bath units, 8 two-bedroom/one-bath units, 112 two-bedroom/two-bath units, and 61 three-bedroom/two-bath units. Russell estimated monthly rents of $1,825, $2,150, $2,200, and $2,500, respectively. (Def's Ex A at 59.)

Using those rent estimates, Russell projected rental income of $6,723,300. He then deducted vacancy, credit loss, and concessions of $537,864, equal to 8 percent of rental income. That produced net rental income of $6,185,436. (Def's Ex A at 59.) Russell also included ancillary income: parking income of $61,854, utility reimbursements of $154,636, and other income of $154,636. After adding those items, Russell concluded effective gross income of $6,556,562. (*Id*.)

Russell projected total operating expenses of $1,311,312, or 20 percent of effective gross income. His expense projection included property insurance, utilities, gas and electricity, water and sewer, trash, general and administrative expenses, advertising, marketing and accounting, turnover, off-site management, payroll, maintenance and repairs, and reserves for replacement. After deducting operating expenses, Russell concluded an NOI of $5,245,250. (Def's Ex A at 59.)

/ / /

3. *Bank appraisal income and expense evidence*

Defendant also submitted a bank appraisal prepared for financing purposes by Western Realty Advisor, with a valuation date of February 8, 2024 (bank appraisal). Neither bank appraiser testified at trial. The bank appraisal also relied primarily on the income approach and concluded with an NOI of $5,131,181. (Def's Ex B at 104.)

The bank appraisal discussed vacancy conditions in the Deschutes County apartment market. It reported first-quarter 2024 vacancy of 7.8 percent but stated that vacancy would be reduced to 5.1 percent if five properties completed in 2023, each with vacancy of 20 percent or higher, were removed from the data. The report also stated that Deschutes County vacancy had remained at or below 5 percent during much of the prior 10 years but that a large number of new units added over the prior three years had increased overall vacancy and slowed rent growth while those units were absorbed. (Def's Ex B at 44.)

The bank's NOI conclusion fell between Plaintiff's and Defendant's conclusions. Plaintiff concluded an NOI of $5,051,744; Defendant concluded an NOI of $5,245,250; and the bank concluded an NOI of $5,131,181.

E. *Cap Rate Evidence*

Because the parties' income and expense conclusions were very close, the principal valuation dispute concerned the cap rate. Both appraisers developed a loaded cap rate by first estimating an unloaded market cap rate and then adding an effective tax rate.

1. *Plaintiff's cap rate evidence*

Plaster concluded that changing market and financial conditions supported a higher cap rate. He reported that sales activity for multifamily properties had slowed significantly since the relatively active market of 2020 through 2022 and was expected to remain so in the near term

because of higher interest rates. In his view, higher rates had placed upward pressure on cap rates and led to lower valuations. (Ptf's Ex 1 at 58.)

Plaster also observed that real estate markets were reacting to a tightening of the money supply intended to curb inflation and to increase borrowing costs. As of the assessment date, the federal funds rate had risen since 2022 to between 5.25 and 5.50 percent. He also noted that two banks collapsed in 2023 and that those events affected the lending industry. (Ptf's Ex 1 at 43-44.)

Plaster considered three cap rate indicators: market extraction, national survey data, and a band of investment analysis. (Ptf's Ex 1 at 99.) For market extraction, Plaster used six apartment sales from his sales comparison approach. Those sales indicated unloaded cap rates ranging from 3.58 to 5.29 percent, with an average of 4.65 percent. (*Id.*) Plaster noted that several of the sales—3, 4, and 6—occurred before a significant increase in interest rates during 2022 and 2023. He also testified that sales 1, 2, and 4 were more contemporaneous but "were influenced in each case by assumable financing that put downward pressure on the overall cap rates[.]" (*Id.* at 100.) For those reasons, Plaster selected the highest cap rate in the group – 5.29 percent.

Plaster also considered national investor survey data. The survey showed fourth-quarter 2023 and first-quarter 2024 cap rates ranging from 3.5 to 6.5 percent, with an average of 5.04 percent. (Ptf's Ex 1 at 100.) Plaster acknowledged that the subject property would likely appeal more to local or regional investors than to national institutional investors. (*Id.*)

/ / /

/ / /

/ / /

Finally, Plaster considered a band of investment analysis. That analysis relied on lender-survey financing assumptions, including fixed-rate 30-year mortgage, a 7 to 10 year call, interest rates near 6.00 percent, and a 75 percent loan-to-value ratio. The band of investment analysis indicated an unloaded cap rate of 6.9 percent. (Ptf's Ex 1 at 100.)

After considering those three indicators, Plaster concluded that an unloaded cap rate of 6.00 percent was reasonable. (Ptf's Ex 1 at 101.) He then added an effective tax rate of 0.679 percent, resulting in a loaded cap rate of 6.68 percent. (*Id*.); *see also* Oregon Administrative Rule (OAR) 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. Applying that loaded rate to his projected NOI produced a rounded value indication of $74,570,000. (Ptf's Ex 1 at 102.)

2.    *Defendant's cap rate evidence*

Russell also relied primarily on market-extracted cap rates from comparable apartment sales in published regional data from CoStar and local sources.[3] (Def's Ex A at 55.) That report indicated continued high demand for apartments in the Bend area. (*Id*. at 44.) Using comparable sales from his sales comparison approach, Russell found rates ranged from 4.58 to 5.81 percent, with an average of 5.50 percent. Russell then added an effective tax rate of 0.71 percent, resulting in a loaded cap rate of 6.21 percent. Applying that loaded cap rate to Defendant's NOI of $5,245,250, and then deducting $250,000 for the incomplete pool, Russell concluded a rounded income approach value of $84.25 million. (*Id*. at 59-60.)

/ / /

/ / /

/ / /

/ / /

---

[3] The report identifies three sources but analyzes only the market sales.

3.    *Bank appraisal cap rate evidence*

The bank appraisal also considered the effect of rising interest rates on cap rates. The bank appraisers interviewed seven brokers in the area and established that all of them estimated an increase in cap rates from 25 to 100 basis points. They concluded that a cap rate of 5.75 percent was appropriate. (Def's Ex B at 102.)

As discussed above, the bank appraisal recognized that the recent addition of new units has increased overall vacancy and slowed rent growth while those units were absorbed. The appraisal nevertheless described long-term demand for apartments in the Deschutes County market as strong. (Def's Ex B at 44.)

The bank appraisal also included a mortgage-equity analysis that indicated a rate near 6.9 percent, similar to Plaintiff's band of investment indication. However, the bank appraisal placed primary weight on market data and concluded that 5.75 percent was the appropriate cap rate. (Def's Ex B at 102.) The bank appraisal deducted property taxes as an operating expense in calculating NOI, rather than excluding property taxes from NOI and adding an effective tax rate to the cap rate as the parties did. Using that rate, the bank appraisal concluded an income-approach value of a rounded $89.24 million and a final reconciled value of $89 million. (*Id*. at 104, 123.)

## II. ANALYSIS

Real market value (RMV) is "the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction as of the assessment date[.]" ORS 308.205(1).[4] RMV must be determined under methods and procedures adopted by the Department of Revenue (DOR). ORS 308.205(2).

---

[4] The court's references to the Oregon Revised Statutes (ORS) are to 2023.

In valuing real property, all three approaches to value must be considered, although not all approaches may be applicable in a particular appraisal. OAR 150-308-0240(2)(a).

Plaintiff seeks affirmative relief and therefore bears the burden of proof. ORS 305.427. A preponderance of the evidence is sufficient to sustain that burden. *Id*. Because Plaintiff seeks a reduction in the tax roll value, Plaintiff must prove that the roll value is wrong and that a lower value is supported by the evidence.

The parties agree that the subject property is a large income-producing apartment complex and that the income approach is the most persuasive method for estimating its total RMV. The parties also agree, for purposes of this case, that the subject should be treated as stabilized as of the assessment date. Their disagreement concerns two valuation questions: first, whether Plaintiff proved a total RMV below the roll value; and second, whether the roll correctly allocated total RMV between land and improvements.

When a relatively modest disagreement in NOI produces a more than $9 million difference in indicated value, the economics of the case indicate that the dispute concerns risk, not income. More specifically, it is about what return investors would have demanded on January 1, 2024, and whether a knowledgeable buyer would have perceived a meaningful risk in interest rates and of future apartment oversupply in the Bend market as of the assessment date. Because, using the income approach, value equals NOI divided by the cap rate, small differences in the rate create large differences in value.

A.    *Total Real Market Value*

Plaintiff's total value argument rests primarily on two points. First, Plaintiff argues that vacancy and collection loss should be higher than Defendant allowed. Second, Plaintiff argues that rising interest rates, tighter credit, and increased market risk required a higher cap rate than

Defendant used. The court agrees with Plaintiff that market conditions as of January 1, 2024, indicated upward pressure on cap rates. The court is not persuaded, however, that Plaintiff met its burden of proof for a lower total RMV.

1.      *Income, expenses, and vacancy*

The income-side evidence is narrower than the parties' value conclusions suggest. Plaintiff and Defendant reached similar conclusions for potential income and operating expenses. Their principal income-side disagreement is vacancy and collection loss. Plaintiff used a 10 percent vacancy and collection-loss allowance. Defendant used an 8 percent vacancy, credit-loss, and concessions allowance. Although the appraisers applied their vacancy allowances to somewhat different income bases, the resulting deductions were the principal source of their NOI difference. The bank appraisal concluded with a lower stabilized vacancy figure but also reported elevated vacancy when newer high vacancy properties were included in the market data.

The court gives limited weight to the bank's 5 percent vacancy assumption. That figure is useful as a normalized long-term check, but it does not fully reflect the market conditions affecting the Bend apartment market as of January 1, 2024. The bank appraisal itself recognized that newly completed properties had increased overall vacancy and slowed rent growth while those units were absorbed.

The court is also not persuaded that Plaintiff proved a 10 percent stabilized vacancy allowance. Plaintiff's evidence showed increased supply, slower absorption, and higher vacancy. Those conditions support a vacancy allowance above the bank's normalized figure.

But Plaintiff's 10 percent allowance gives too much weight to near-term absorption pressure in a market that continued to show population growth, rising rents over the relevant period, and demand for multifamily housing. Treating the subject as stabilized also weighs

against adopting a vacancy allowance that reflects temporary lease-up or short-term absorption conditions.

Defendant's 8 percent vacancy allowance is best supported by the record. It recognizes elevated market vacancy as of the assessment date without overstating temporary supply pressure. It is also generally consistent with the bank appraisal's reported 7.8 percent first-quarter 2024 market vacancy when newer high-vacancy properties were included. The court therefore gives primary weight to Defendant's vacancy allowance and Defendant's NOI conclusion of $5,245,250.

2. *Cap rate and tax loading*

The cap rate evidence presents a closer question. Defendant's 5.50 percent unloaded cap rate relies on market-extracted sales. Market extraction is generally persuasive because it reflects actual investor behavior when the sales are comparable and properly verified.

However, Defendant's rate does not adequately account for the evidence that market conditions changed materially during 2022 and 2023. Interest rates increased sharply, credit conditions tightened, and sales activity slowed. Plaintiff also presented evidence that some of the more recent comparable sales involved assumable financing. That matters because assumable below-market financing can increase the price a buyer is willing to pay. A higher purchase price, all else equal, produces a lower extracted cap rate. To that extent, financing-affected sales may understate the return that a buyer using current market financing would have required as of January 1, 2024.

Plaintiff provided persuasive evidence that an upward adjustment from Defendant's 5.50 percent unloaded rate is warranted. Plaintiff did not prove, however, that a 6.00 percent unloaded rate is supported by the record. Plaintiff's market-extracted rates did not themselves

support that conclusion. Plaintiff selected the upper end of the market-extracted range but did not sufficiently quantify the effect of assumable financing or explain why the highest extracted rate should control.

Plaintiff's own market-extraction evidence does not support selecting a 6.00 percent unloaded cap rate. Plaster gave greater weight to the more recent sales, which was reasonable given the change in interest rates during 2022 and 2023. However, one of those sales closed in February 2024, after the assessment date, and is better treated as confirmation rather than primary evidence of the January 1, 2024, rate. That sale indicated a 5.20 percent rate that generally supported another recent sale at 5.29 percent. Plaintiff did not persuasively explain why the highest extracted rate should be selected rather than a reconciled rate from the market-extraction evidence. The court finds that Plaintiff's market-extraction evidence supports upward pressure from older or financing-affected sales but does not itself support a 6.00 percent unloaded rate.

The investor survey also supports upward movement, but not Plaintiff's final conclusion. The survey showed an average cap rate of 5.04 percent for the fourth quarter of 2023 and first quarter of 2024, up from 4.51 percent in the first quarter of 2023. That evidence is consistent with rising interest rates placing upward pressure on cap rates. However, because the survey included national investor data and the subject property was more likely a local or regional investor property, the court gives the survey less weight than market-extracted sales.

The band of investment analysis was useful because it reflects the effects of the then-current borrowing costs. Its indicated rate of 6.9 percent supports Plaintiff's general point that current debt costs would push required returns higher than older financing-affected sales might suggest. Its weakness is that it depends heavily on assumed financing terms and investor-return

inputs rather than closed sales prices. The court therefore gives the band of investment analysis weight as directional evidence but not as controlling evidence of the appropriate cap rate.

Taken together, Plaintiff's indicators support an unloaded cap rate higher than Defendant's 5.50 percent but lower than Plaintiff's 6.00 percent. Plaintiff's recent market-extraction evidence was in the low-to-mid 5 percent range. The national survey averaged 5.04 percent. Plaintiff's band of investment analysis indicated 6.9 percent, but that method is more assumption dependent.

The bank appraisal provides a useful contemporaneous check. It was prepared near the assessment date and also recognized upward pressure on cap rates. It concluded that a cap rate of 5.75 percent was appropriate. The bank's treatment of property taxes differed from the parties' treatment, but the court finds the bank's rate is roughly comparable to the parties' rates. However, neither bank appraiser testified, and the bank appraisal was prepared for financing rather than Oregon ad valorem tax purposes. The court therefore gives the bank appraisal limited weight.

The court finds that an unloaded cap rate of 5.75 percent best reconciles the evidence. Defendant's 5.50 percent unloaded rate understates the effect of rising interest rates, tighter credit, and financing-affected sales. Plaintiff's 6.00 percent unloaded rate overstates what the evidence proves. A 5.75 percent unloaded rate recognizes the changed interest rate environment without giving controlling weight to assumption-driven financing models.

The court applies Plaintiff's effective tax rate loading factor. Defendant used a 0.71 percent loading factor in its appraisal but acknowledged at trial that Plaintiff's 0.679 percent factor was correct. The court therefore adds 0.679 percent to the court's unloaded cap rate of 5.75 percent, resulting in a loaded cap rate of 6.429 percent.

3.    *Total RMV reconciliation*

Applying the 6.429 percent loaded cap rate to the court's adopted NOI of $5,245,250 produces an indicated value of approximately $81.59 million.  Even after deducting Defendant's $250,000 adjustment for the incomplete pool, the indicated value remains approximately $81.34 million.  That amount exceeds the tax roll total RMV of $79,169,620.

Plaintiff has shown that Defendant's cap rate was somewhat low.  Plaintiff has also shown that vacancy was elevated as of the assessment date.  But Plaintiff has not proved the combination of vacancy and cap rate necessary to support a total RMV below the roll value.  The court therefore sustains the subject property's total roll value of $79,169,620.

B.    *Land and Improvement Allocation*

The court's conclusion that Plaintiff failed to prove a lower total RMV does not end the analysis.  Plaintiff also challenged the roll's allocation between land and improvements, and that allocation has independent significance because this is the first assessment year after completion of construction.

For real property, the assessment roll must separately state the RMV of the land, excluding buildings, structures, improvements, and timber, the RMV of all buildings, structures, and improvements, and the total RMV of the parcel.  ORS 308.215(1)(a)(E), (F), (I); OAR 150-308-0310(1)(a)-(c).  When new property or new improvements are added to the roll, the value of the new property or new improvements affects the MAV calculation under ORS 308.153.

The court is not determining separate MAVs for land and improvements; MAV is determined for the property tax account as a whole.  However, where new improvements are added, the amount of total RMV attributable to land and the amount attributable to improvements are relevant to the exception value calculation.  Thus, even though Plaintiff has

not proved a lower total RMV, the court must still determine whether Plaintiff proved a different land/improvement allocation.

Highest and best use "means the reasonably probable use of vacant land or an improved property that is legally permissible, physically possible, financially feasible, and maximally productive," resulting in the highest RMV. OAR 150-308-0240(1)(e). The DOR's appraisal guidance states that land value is based on the land's highest and best use as though vacant, even if the site is improved. Oregon Department of Revenue, Appraisal Methods 5-2 to 5-3, 150-303-415 (Rev 05-17) (DOR Manual).

The DOR Manual further states that allocation and extraction procedures may be considered when current vacant land sales are unavailable, but both are less reliable than direct sales comparison and should be used with caution. *Id*. at 8-2. For land valuation, the DOR recognizes market-derived units of comparison including front foot, square foot, acreage, site, and "per unit or space." For multi-family sites, the DOR states that such sites are often sold on a potential per-apartment or unit basis. However, the appraiser should verify the number of units allowed by zoning and should value the land by the highest number of feasible units because existing units may not represent highest and best use. *Id*. at 8-7.

The parties' land value conclusions are not materially far apart when viewed in relation to the value of the entire subject property. Plaintiff's $7.8 million, Defendant's $6.7 million, and the bank's $7.41 million are relatively close. That closeness suggests that all the analyses are capturing, at least broadly, the same market for multifamily land.

The court finds that Plaintiff's land-value evidence is more persuasive. Plaintiff used a price-per-unit methodology that better reflects the way market participants value multifamily development land when achievable unit density drives value. The subject property is a large

apartment complex, and its land value is tied more directly to the number of legally and physically supportable apartment units than to raw square footage alone.

Defendant's land analysis has strengths. Russell made explicit adjustments for factors such as time, location, lot size, condition, and zoning. However, Defendant's price-per-square-foot method does not explain as persuasively how the market prices density-driven multifamily land. A per-square-foot method may be useful, but on this record, it does not capture the economics of achievable apartment unit yield as directly as Plaintiff's method. Several of Defendant's land comparables occurred after the assessment date and are better treated as confirmation rather than primary evidence. In addition, Defendant relied in part on a listing, which receives little weight because it was not a completed market transaction.

The bank appraisal also supports Plaintiff's land-value conclusion. The bank used a per-unit methodology and reached a land value closer to Plaintiff's conclusion than to Defendant's. The court gives the bank appraisal limited weight because neither bank appraiser testified, but its land analysis is useful as a check on the reasonableness of Plaintiff's method and conclusion.

Plaintiff's land analysis is not perfect. Plaintiff's adjustments were not as quantified as Defendant's. Even so, considering the subject property's multifamily use, the zoning, the unit-based nature of the market evidence, and the bank appraisal's corroborating land conclusion, the court finds Plaintiff's land value more persuasive.

The court finds the subject property's land RMV is $7,800,000. Because the court sustains the total RMV of $79,169,620, the improvement RMV is the residual amount of $71,369,620, subject to allocation between the two accounts.

/ / /

/ / /

### III.  CONCLUSION

After careful consideration, the court finds that Plaintiff did not meet its burden to prove a total RMV lower than the tax roll.  However, Plaintiff did meet its burden to prove that the roll undervalued the land component of the subject property.  Now, therefore,

IT IS THE DECISION OF THIS COURT that Plaintiff's appeal is allowed in part and denied in part.  The total RMV for the subject property of $79,169,620 is sustained.  The land RMV is $7,800,000 and the resulting improvement RMV is $71,369,620.  Defendant shall correct the land/improvement allocation consistent with this decision and recalculate MAV, if necessary, under ORS 308.153.


_____
RICHARD D. DAVIS
MAGISTRATE

*If you want to appeal this Decision, file a complaint in the Regular Division of the Oregon Tax Court, by <u>mailing</u> to: 1163 State Street, Salem, OR 97301-2563; or by <u>hand delivery</u> to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your complaint must be submitted within <u>60</u> days after the date of this Decision or this Decision cannot be changed.  TCR-MD 19 B.*

*This document was signed by Magistrate Richard D. Davis and entered on July 31, 2026.*